We'll now move to the second and, as it turns out, last case on our argument calendar. That's Maso Capital Investments v. E-House. So is it Mr. Bissell Linsk? Yes, Your Honor. Am I pronouncing that right? Yep. All right. So Mr. Bissell Linsk, you have ten minutes total, but you reserve three minutes for rebuttal. So that gives you seven minutes out of the gate. You may proceed. Thank you, Your Honor. May it please the Court. My name is Jake Bissell Linsk of Lead Counsel, Labaton-Sushiro, on behalf of Petitioners Maso and Altamayo. E-House was a publicly traded company taken private through a management buyout led by Defendant Zhao of E-House. Can I ask a quick question before you get into the guts of this thing? Why is there not a Morrison extraterritoriality problem here? Nobody addressed it, and maybe it's waived or forfeited, but it wasn't obvious to me why there wasn't a problem. Yes, Your Honor. That issue was raised in another of these cases involving these Chinese go-private mergers, the Shonda Games case, which is cited in the briefing. And what we argued in that case is that the first prong of, I believe, the absolute activist test, which looks to whether or not the securities trade on a domestic exchange, fully applies here. These are the entire case— Any shares that are ADSs, you're saying, on a U.S. exchange meet that test? I'm saying that when the class is people who purchased the ADS on a U.S. exchange, those people are entitled to the protections of U.S. securities laws. Well, it wasn't even obvious to me whether that covers your whole class here or covers even the plaintiffs here. We allege that we purchased our share—the lead plaintiffs allege that they purchased their shares on the exchange, and there's not been any issue about absent class members at this stage in the case. We clearly allege that we purchased our shares over the exchange, so we believe this clearly falls under that prong of Morrison. We, in the Shonda case, had a whole bunch of other arguments about why we also satisfy the other prong, that this would be involving domestic transactions otherwise, but that issue hasn't been raised here, and it hasn't been briefed here. And I will say that while the Morrison case talks about sort of the extraterritorial application of U.S. laws, it's treated as a merits issue, not a jurisdictional issue. I agree with that, and that's why, I mean, it may be that this is all forfeited or waived at this point. I'll ask your adversaries in a second. Okay. So defendants have, in our view, challenged a number of facts in this case improperly, but I do think there are several key facts to go over that I don't think are in serious dispute. Before the buyout closed, there existed a set of projections that were approved by Defendant Zhao and audited by PWC that projected four times greater growth than the projections that were publicly— So that's the buyer's group, right? The projections? Yeah, the projections. I mean, it's not clear to me exactly who prepared these things, but you're really saying that it was the buyer's group that prepared them, right? I don't think that we are alleging that they were prepared by the buyer's group, because— Who do you think they were prepared by? I think that they're management projections, and one of the allegations that we have is that they were management projections in the same form as the management projections that were disclosed, and that they replaced the management projections, which had become outdated. And what's the basis for that? Are there some sort of rough statements that are kind of summarized out of proceedings in the Cayman Islands? That's what you're relying on? I don't think they're rough statements. They're not verbatim transcripts, right? It is not a verbatim transcript. It is our pleadings based on what we believe is an adequate basis to allege what was stated there, and what was stated there was informed by voluminous discovery. I'm sorry to interrupt you, but your time is tight. What was stated there that leads you to conclude that these were management projections as opposed to the buyer's group's projections? So, one of the things that was stated there is that the projections—we state at paragraph 104, which is in the appendix at page 47 to 48, that the projections were used for internal purposes, that the newer projections replaced the 2016 management projections, which had become outdated and which were superseded by the newer projections to the companies— But I don't know what that means. I mean, that's just kind of words. But what is the basis for saying that these were prepared by management? I think the—I don't think we specifically allege who at the company prepared them, right? But what we do allege is that the projections replaced the other projections that were being used for— But what does it mean to replace the other projections? So the company had one set of working projections that were its view of the performance of the company, and these new projections were prepared, they were audited by PwC, they were approved by the CEO of the company— But PwC is whose auditor? All I know right now is that PwC audited the projections. But I think the key point here is, in the first instance, it doesn't hugely matter for any of our claims whether or not the projections were prepared by the company or the buyer group. Zhao was the CEO of the company and on the buyer group. He clearly knew about the existence of these updated projections, and they didn't disclose these updated projections. But that raises a different issue, it seems to me. So if Zhao, as the buyer, who is also an insider, has his own internal views as to what this company is worth and what value can be unlocked by going private, your view is that he has a fiduciary duty to give that up? We allege that there are multiple reasons why he had a duty to disclose this, as well as false statements, due to his— I'm just trying to play this out. So in other words, the market price is much lower, right? The share price. And so there's an offer to give a premium on that to take it private. And you're saying, I think, that because he is the CEO, the fact that he has a rosier view of what this thing might actually be worth, he has an obligation to share that rosiest view with the shareholders. Is that right? Yes, and I have two sort of separate ways of answering that. One is that he absolutely has an obligation under Section 13, which specifically says that you must describe the effects of the transaction on the buyer group, and that conclusory statements will not be sufficient, that the benefits of the transaction for the buyer group need to be quantified to the extent practicable. That's cited in our complaint at paragraph 151. So the regs envision that this is not just publish whatever the company has. It's also describe the effect of this on the buyer group, and that fits with the unique situation of a Section 13 transaction, which is transactions that take private transactions by people who have a prior relationship with the company. So the SEC clearly envisioned a world where you actually do have to disclose your projections. We also believe that under— Why are they not just opinions? Because these aren't just—that was sort of my second response, which is he doesn't just have some rosier view about the company. That's a different scenario if he just sort of privately had some subjective view that the company might be worth more. That's where the fact that these were audited by PWC takes on some significance. These were, in fact, prepared projections that were disclosed before the merger even closed to potential buyers, immediately after the merger closes in the same month in August. There are deals closed where those projections are built into those deals and where the company—where the buyer's group provides a financial guarantee that those projections will be met. So the question isn't does a buyer have an obligation to say, by the way, I might like the company better than you? No, but he does have an obligation to disclose concrete information that he has suggesting that the company is undervalued in the deal. So I just—I wanted to go back to something that you—I thought I heard you say earlier that it was not disputed. I understood that defendants said that they prepared them after it closed. Is that— So the next line I was going to say is there is some dispute about when they were prepared, whether or not they were prepared in June, or whether or not they were prepared after June but before the merger closed. There's no dispute that they were prepared before the merger closed, and we believe there's no proper dispute as to whether or not they were prepared in June. We allege it directly and outright. We say the projections were prepared in June based on statements made in open court by somebody who had extensive discovery, and you can read the pleadings in the text slides. There seems to be a dispute as to who prepared them. I mean, were they prepared principally for the buyer's group? They would have different obligations, I suppose, or were they really part of a management's projections? I don't believe there's any dispute about who—about what the purposes of these projections were. It's alleged in the complaint that they were used internally by the company, and as I said before, even if they were just Zao's projections, they would still be actionable. But I don't believe there's any proper dispute. And under the appropriate pleading standards, where you take all facts alleged as true and you interpret them in the light most favorable to the plaintiffs, it would be improper at this stage to assume that they were prepared by the buyer group only and for the buyer group's purposes, given the pleading. That would be taking an inference against the plaintiffs. My colleagues will indulge me. I'm interested in your fair value assessment. Are you asking us to create new law? I didn't find anything about fair value as a sign of loss causation in the 10B context. So we say— We can. I just need a straight answer as to whether or not you think we are free to do this or whether or not we need to analogize and therefore it's the most appropriate thing to do. I don't think that this is new law at all. If you look at the cases that we cite in that section of our briefing, there are countless cases at the Supreme Court level, the Second Circuit level, and district court level that all speak to the fact that when a person is defrauded into selling their shares, the question is, what is the fair value of the shares and what did they receive? And the difference between that is their damages. And we believe that there's cases at the Supreme Court that Mills and affiliated youth both speak to that directly, and there's numerous cases at the Second Circuit level that speak to that. So fair value. You don't have to show that somebody actually would have bid that fair value price. You just have to show that there was a platonic ideal of a fair value. We believe the precise number of the fair value is a fact question. And numerous cases say it's an issue that experts can opine on at trial. But as to whether or not the fair value is something that we need to show we would have obtained for this deal, that's in some sense putting the cart before the horse because our claim here is we were defrauded into parting with a share that had a fair value. That's a fact question. There's two different things. There's loss causation and there's transaction causation. And it seems to me you're conflating the two. The fact that you may not have parted with the shares is transaction causation, right? Correct. Loss causation is showing that you would have achieved this higher share price that somebody would have paid the fair value, right? No, Your Honor. No? Why not? The second question is whether or not we suffered a loss due to the transaction we were induced to participate in. So the induced part is reliance and transaction causation. The whether or not we suffered a loss question can be answered in some cases by saying another transaction was in the wings and that would have made this, you know, a better deal that I was deprived of. But in this case it's enough and in many cases it's enough to simply say- But you also have some plaintiffs who sold their shares and the argument is that they would have gotten more money and the price would have been higher. Exactly. There's sort of two ways of looking at it but I think they really reach the same result. One is the market price would have been higher if truthful disclosure would have come about. But the other argument which is even simpler is just I had a share that had a fair value. That's a fact question but I had a share of a certain value. I gave up that share for some consideration. That consideration was worth less than that fair value and that's a loss right there. The question of whether or not I would have then- But for this fraud I would have sold my shares to someone else at a higher price is actually not the question that's probed by this fair value question because I'm immediately suffering a loss when I give up something that's very valuable for less consideration than it's worth. It doesn't need to be that I had another sale lined up. Having merely given up that share, that valuable share for less than fair value is a loss equal to the difference between the value of that share and the price that I sold it for. It seems to me that it's pretty similar to transaction causation. But the district court didn't really get into loss causation. I mean it mentions it a couple of times in the opinion. One saying I'm not going to rule on it. The other time saying that you were lost on that ground too. But we're free to, I guess, we could affirm on any grounds I suppose if we find it from the pleadings that there's insufficient facts that would support any of the elements here, right? I think that that's true that it's de novo review. But I will say that the cases that we cite show that this is the right way of looking at it. That there isn't a need to show sort of counterfactual scenarios beyond that I was induced to sell my shares. And that if you did impose a rule requiring some sort of a detailed counterfactual about precisely what would have happened but for this fraud and if I would have sold to somebody else, you would essentially be opening the floodgates to this kind of fraud. It would be almost impossible to prove that in any situation. And so as was stated in a different case oral argument before this court, one of the judges, I believe it was Judge Engelmeyer said, that would set up a situation where even if lied to like crazy, plaintiffs would have no remedy. And that's exactly what would occur. If you set up a rule where fair value isn't the measure and you must precisely show the entire but-for world of what would have happened except for the fraud, you're completely opening the door to there's no remedy for a fraud like this. And that's not a policy that makes any sense. And it's also not a policy that's equitable to investors. Well, it seems to me you could plead facts that would address that problem. I'm just not sure you did. I think only in a scenario where there is an alternative merger lined up, that's a scenario where you might have facts. But there are countless cases where somebody is merely tricked into selling something for less than it's worth, and you suffer an injury immediately upon that sale, and it would be closing the door to all of those kind of situations. Like I'm not sure what kind of facts we could possibly plead, what anyone could plead to reconstruct a counterfactual world that didn't happen because of the fraud. All right. Well, you've got three minutes for rebuttal. Let's hear now from Mr. Klein. Mr. Klein, can you start there, though? Can you talk about how you think this lack of a buyer fits into loss causation? Yes. Thank you, Judge Perez, and may it please the Court. The long-established case law is clear. In order to plead loss causation, plaintiffs have to plead a non-speculative loss caused by the disclosure that they're challenging, not that the shares are undervalued in some generalized sense. And we would submit that Gravy Wesco that this Court issued and other recent decisions by the Ninth Circuit, the Third Circuit, and the Seventh Circuit, which are cited in our brief, are all directly on point and confirm that the kind of speculative claim of loss causation here is simply not sufficient under the securities laws. I think Judge Sullivan's point is exactly right. One could easily imagine cases where plaintiffs plead facts that do satisfy this loss causation, the well-established loss causation requirement. It could be a more lucrative alternative transaction that was foregone. It could be a case where, upon the disclosure of the proxy materials or the other challenged disclosures, the market price decreased, which is sort of the standard way in securities laws that one would allege a loss. But nothing like that is alleged here. The merger price was a... What about the shareholders who sold their shares after the merger was announced, before the merger closed? The argument there is the market value would have been higher with proper disclosure. And so don't they suffer loss as a result of the nondisclosure? Thanks, Judge Chin. No. I mean, there's certainly no nonspeculative loss that's alleged, because upon release of the proxy materials, the market price went up as well. I think the pleadings confirm that the market price increased 4.3 percent. Right, but that doesn't work. I mean, I think there's some... That's part of the reason why I'm struggling as to whether or not the loss causation analysis that you give us would work in this kind of scenario. The argument is not that these shares were worthless. It's that they were forced to sell them at a price that was less than what they could have gone for that. And so I feel like part of why at least I'm struggling is how do we deal with this particular scenario, which is not what the easier cases when dealing with loss causation is. Right. No, and I think it's just you get down to the bedrock of what the securities laws are intended to redress, the remedies they're intended to provide. So basically you're focusing on speculativeness. I mean, again, I started off with the what do you make of... Yeah, I think two things, Judge Perez. One, the loss can't be speculative. So here you have plaintiffs who received a 15 percent, you know, the market price increased 4 percent. The argument is the market price would have increased even more had there been proper disclosures. But that proposition and all these recent cases, all the recent cases say that is too speculative to allege a cognizable loss. So, Judge Perez, to your question, number one, the issue is speculativeness. It's purely speculative to say that under different disclosures plaintiffs would have gotten even more, an even bigger premium. But second, it goes to the core of what the securities laws are designed to do. So going all the way back to Dura Pharmaceuticals, which was one of the Supreme Court's first treatments of loss causation, Judge Breyer's decision made a very specific distinction between protecting share value in some general sense versus redressing the injuries that specific disclosures actually cause. And he made the point that the securities laws just do the latter. Well, I'm confused. I thought your argument, I'm sorry, Judge Shin. I apologize. I thought your argument was that because there wasn't a buyer, their injury was too speculative. You're actually saying because they can't tell you how much they would have gotten, it's too speculative. No, well, so those two things are not inconsistent. I think in some ways we're saying both. Right? Both are problems with this. Number one, they can't point to any specific facts, in the record or otherwise, that confirm that they were injured by the disclosures. Meaning if the disclosures had been different, if the disclosures had been the way they wanted, that they would have somehow realized more value. And that's what all the recent cases say. And so when you're asked, okay, well, what could possibly satisfy that standard? It could be an alternative transaction. It could be a market drop in the price when the disclosures are issued. But the more fundamental point is they can't simply rely on this sort of ipsy-dixy speculation that if the things we don't like about the disclosures had been changed, the market price might have gone up. Okay, so they rely on the updated projections? So they try to rely on the updated projections. But it's still entirely speculative whether those updated projections had been disclosed, whether the shareholders could have possibly realized more value because of that. I mean, you'd have to articulate an entirely speculative chain of causation, that the merger somehow would be voted down, right, that some better deal, that the buyer group would have offered more, there would be some better deal. There's simply no basis for anything like that in the record. And, in fact, the facts that are alleged indicate that no better deal is available. They had a market check of 29 potential buyers. Nobody was interested. So this, for all intents and purposes, for all that appears on the record, this was the best deal that could be had for this company at the time. There's nothing alleged to the contrary. Can I ask you the margin question? I mean, are you waiving that argument? Are you saying that there is no extraterritoriality problem here? There may be an extraterritorial problem with respect to the tendering shareholders whose shares were exchanged in the merger. We did not advance that argument in part because they also advance claims on behalf of the selling shareholders who sold on the market for the merger on a U.S. exchange. So your view is anybody who bought or sold on an ADS is going to meet the domestic transaction requirement? Well, so we haven't taken a position on that specific issue, so I don't want to categorically say that. All right, but you forfeited or waived it, arguably, right? It's not jurisdictional, so we have no reason to go back and revisit that, ma'am. I mean, that would be up to the panel. We did not advance that argument. You're not asking us to? No. All right. I mean, your briefing lays out a number of reasons why you think we should affirm, one of which is loss of causation that we spent a lot of time on. You also then also suggest that we could affirm for pretty much the same reasons that Judge Ramos did. Yes, Your Honor. And then you also float Sienta as an independent reason. So why don't you rank them for us? No, well, so we think Judge Ramos' opinion was entirely correct. Even on safe harbor? Perhaps not on safe harbor specifically, but as we articulated in our brief, under the bespeech caution doctrine, you get to the same place. There are forward-looking statements accompanied by meaningful cautionary language, so that would negate the claim there as well. The cautionary language was something that I'm going to need some explaining for, please. So we're supposed to have – like the purpose of these 10B laws is to prevent deception and to make sure that individuals purchasing securities are given proper information. I, quite honestly, read your briefs to suggest we could do whatever we want as long as we had this cautionary language, and I would like to know where – I know you won't stick to that here, so tell me where we draw the line because that's frankly bananas. So we need you to tell me at what point does it become too much, and are you guys just being too cute with the cautionary language? No, I don't think so, Your Honor, and our position is certainly not that sort of boilerplate cautionary language forgives all sins, right? So we're certainly not saying that. But here the cautionary language around the January projections specifically is very explicit, and it makes very clear that the projections are intended basically just as a snapshot at a particular point in time of certain information that was given to the special committee's financial advisor. Sorry, Judge Chiu. The proxy says that the projections referring to the original projections reflect the best currently available estimates and judgments, and if in fact you had some parallel projections at the time that they made the statement, why isn't that a misrepresentation? Okay, so thank you, Judge Shin. Two answers to that question. First, the read in context, the best currently available language, is part of literally six pages of disclosures that describe exactly the fact that the projections are just intended to give shareholders the same information that was provided to Duff and Phelps as a financial advisor. It was not provided for another purpose, and it wasn't going to be updated even if updates were provided. So no reasonable investor could expect that those were going to be updated going forward. But the representation is this is the best that we currently have. And if that's not true, why isn't that an actionable false statement? Yes, Judge Shin. So we think the disclosures and the sort of caveats around that read in context make it clear that that was as of January 2016 when the projections were made. But I want to get to the second point, which is that plaintiffs have not alleged facts establishing that the alternative projections were in fact made or available at the time that the proxy was issued on July 1, 2016. So they have an allegation that these were available in June or before the merger. Yeah, that's solely based on plaintiffs' gloss on the argument of counsel in the Cayman appraisal proceedings. It's not just the argument of counsel. I mean, there apparently were exhibits, including that were received in evidence in that proceeding. Apparently. I mean, it's hard to know because they're not part of this record. There's just a general question if they're in dispute, if either who created them or when is in dispute. Isn't that something that needs to be a jury trial on or at least needs to go back to the district court for a later stage? If there was a legitimate factual dispute, yes. But in this case, the assertion that the projections were made and available in June can't be squared with the specific factual allegations that actually are in the complaint, which say that the only time that the projections were used were at the earliest time was at a meeting with investors in the buyer group on July 26, almost a month after the proxy. And it says that the new projections incorporated the result of the first half of the year, quote, unquote. That would be impossible if they were made in June because the first half of the year wouldn't have ended yet. So it's not just that it's not just that the cautionary language protects the company and the buyer group on this, though it does, it's that they have not the idea that the projections were made in June can't be squared with the specific factual allegations that are in the complaint. Can you talk about that you're, this is a similar question with respect to the financial interests for CNTER. You've got very sweeping language about having general interest of making money isn't enough, but I'm also worried about it swallowing the rule, right? I mean, if people are motivated by financial interests, which is part of the reason why we have security law to begin with, like how is it that we side for you without opening the floodgates such that we're never going to be able to prove CNTER? Well, so CNTER obviously requires specific factual allegations that indicate that a defendant acted knowingly or recklessly. And having a pitch deck that says that there's higher projections, is that enough? So again, a pitch deck used by the buyer group for separate meetings that it's not even clear is connected to a relisting plan necessarily, generated after the proxy was issued, has no bearing on whether projections made six months earlier that were expressly cabined in the disclosures for a specific purpose were false or misleading. But I would just say that on the motive and opportunity, which is I think what you're getting at, right, on the motive and opportunity, which is the other way to estab to plead CNTER, plaintiff's position is just that because the buyer group wanted to achieve a favorable price on the deal, that therefore they had motive and opportunity to commit fraud. But there's no limiting principle to that. I mean, under that logic, literally – I would ask the inverse. So where is the limiting principle to – I mean, because there is some limiting principle, right? We have a fair value and we have a loss causation, right? But where is the limiting principle to I just wanted to get the most favorable price? No, no. So we're not saying that getting the most favorable – wanting to get the most favorable price is per se permissible. What we're saying is based on that you cannot infer just based on the desire to achieve a favorable price that therefore a buyer group in a going private transaction had motive and opportunity. Literally every single – Like the buyer group was the CEO, right? So it was the biggest insider with the biggest amount to gain and the biggest knowledge of the information. And that's true in many going private transactions. The status of the buyer group as insiders, as executives of the company, were expressly disclosed in the proxy materials. And the proxy actually told investors the buyer group's interests are different from yours. So we're not saying that the desire to achieve a favorable price somehow insulates them. We're just saying you can't take that fact alone and infer center. There have to be some factual allegations about what the defendants actually knew, actually intended, and that they're being reckless or intentional, which we think they've not alleged here. And it's not a ground that Judge Ramos reached, but this panel certainly could reach it. Well, I'm just a little bit confused because I thought you said one of the things that you thought was in dispute was whether or not the buyer group produced the projection. And if the buyer group produced the projection, then don't they then have the incentive and the information to – the motivation to be able to make it happen? Sorry, Your Honor, which projection? The January 2016? The projection that it's going to increase, the projection at issue. I just feel like on one hand you're saying we don't know who did it, so we can discount it, but on the other hand you're saying, oh, it's very common for people. So we think – I think there are a couple different issues sort of in play here. So I'm just trying to disentangle them, so bear with me. So we think a fair reading of the complaint indicates that it probably was the buyer group that made these projections, although as Judge Sullivan noted, the complaint's not entirely clear. The factual allegations aren't entirely clear on that. But that no matter – regardless – Is there anything from the Cayman Islands or from the complaint here that says that this is management's parallel projections? Not that we're aware of, Your Honor. Not that we're aware of. Certainly nothing is alleged in the complaint. And again, it's hard to know because we don't have the alleged slides in front of us. They're not attached to the complaint. It's hard to sort of argue this in the abstract. But I think, Judge Perez, going back to your question, you know, there are a couple different issues here. So we think it was the buyer group, probably, fairly read. It sounds like it was the buyer group that made these projections. But all the factual allegations indicate that they were used and generated after the proxy was issued. So they couldn't have rendered the proxy materials inaccurate at the time that those proxy materials were issued. In addition, the buyer group had nothing to do with the January 2016 projections. The proxy expressly disclosed that those were made by management, that they were provided to their financial advisors, and that the buyer group was not involved precisely because they stood in a different position of the transaction than the company. So, you know, whether, even if, even if one thinks that the buyer group, you know, may have generated some alternative or different set of projections in June, which we don't think they've alleged, but even if that were assumed, it would not render the earlier projections that were done at a different time for an entirely different purpose false when they were issued. Well, I mean, I'd ask you, I guess, to respond to something that Mr. Veselinsk said, which is he seemed to suggest that the buyer group, by virtue of being insiders, have an obligation to share their rosy projections. They have a fiduciary duty to do that. And I guess I'd like to hear your response to that. Yeah, there's nothing in the law that requires that. And, in fact, you know, in this sort of a situation of going private transaction, that would, in fact, be anomalous. I mean, they are the counterparty across the table. Well, that would chill insiders taking companies private, right? Wouldn't it? I'm sorry? It would, it would seem to me, it would chill insiders from taking a company private because they would be at a disadvantage over third parties that would have no obligation to disclose their rosy projections. Judge Sullivan, that's exactly right. But also, you know, the positioning of the buyer group relative to the special committee and the company in a going private transaction is expressly disclosed. It's expressly disclosed that they're across the table from the company. No, I get that. But I guess, so it seems to me that the buyer group misled, I mean, the insiders, the CEO was in the buyer group, right? He was. Yeah. So if he is misleading the independent directors, that would be actionable under the securities laws, right? He is deliberately misleading them about the earnings of the company. Perhaps, Your Honor, but there's nothing like that. I know there's nothing like that here. But that, you would agree, would be actionable. I would think so. If facts were alleged, you know, that showed that, that perhaps could be a theory. But there's nothing in this complaint that alleges that the wool was pulled over the eyes of the managing committee, right? No. No, of course not. I mean, there's a whole process set up with a special, an independent special committee with independent legal advisors and financial advisors. Is there a CWC? Who do they advise? Well, we just know what's in the complaint, Your Honor. So it's alleged that they audited the financial statements. We don't know more of the surrounding facts than that because, again, it's taken from, you know, plaintiff's summary of arguments of counsel in a separate proceeding. No more detail around it than that. All right. Well, unless there are other questions, we've kept you over. Okay. We'll hear from Mr. Veselance for three minutes. All right. Thank you, Your Honor. Thank you. I'd like to address loss causation, but before so I'd just like to correct one thing that was said that's happened throughout this case. The opposing counsel stated that the facts show that the projections, the updated projections, were rendered and used beginning in July. That is not what we allege. We allege as a simple factual matter that they were made in June, not rendered in July. You don't offer any facts to support that. That's a conclusory assertion. So what are the facts alleged in the complaint that support that assertion? The facts alleged are that that was a statement made in open court by somebody who had extensive information about those projections through discovery in the appraisal action. And if you compare that statement to the standard that is applied to confidential witnesses, the standard that's applied to confidential witnesses, here we have a named witness who represents. What is the statement that you are quoting from? It's on paragraph 104, which is 47 and 48 of the appendix. And it states, the dissenter's counsel also explained that the PTPs, that's the word for the updated projections, were made in June of 2016. And that is surrounded by paragraphs of context about the discovery that he had access to, that the updated projections were used by both sides in the appraisal proceeding, that they were entered into the record as exhibits. So if the standard here is a simple factual matter is treated as a conclusory statement, unless we can give every possible detail about it, it will be impossible for plaintiffs. Can we rely on what a lawyer argued in another proceeding? I'm a little concerned about that. Yeah, it's not an argument. It's a factual statement made in court. It wasn't some, here's a conclusion you should reach, or it wasn't a conclusory allegation by a counsel in another case. And if you look at the standard that's applied to confidential witnesses, well-established standard. The question is, is the person in a position to know the information provided? That's the standard that's applied to confidential witnesses. Right, but usually confidential witnesses are people that are, you know- Personal knowledge. Right, you speak to people with personal knowledge. You are just citing somebody who you could have talked to, but you didn't, right? This is a person who does have personal knowledge. But you're not relying on this person for what they told you in drafting the complaint. You're relying on something that was said in a Cayman proceeding for which there's not even a transcript, right? So that is correct, but there's no question that the person said this in that proceeding. That's not a question in the record at this point. And so it is a simple factual allegation in our complaint that needs to be accepted as true under the applicable pleading standards. And to hold otherwise- Even though you don't have these documents. We would love to have the documents, but we're not in discovery yet, and so we don't have them yet. And so if the projections were prepared in July, that will be something that is readily shown in discovery in this case. We just don't have the ability to get discovery until we're over the motion to dismiss. What we need to do right now- The good faith basis for believing they were prepared in June, that good faith basis is what counsel argued in that case. What counsel stated in that case, yes, Your Honor. And we- But counsel doesn't offer any explanation for that statement, right? He's talking in the context of reviewing these projections in which he provides extensive information about them. So the context is- He's not a witness either. He's making an argument. I mean, that's one of the concerns I have. He's characterizing and describing the discovery that he has received and the information that will be a principal point of information in that case. And so this isn't somebody making some off-the-cuff statement or something that is irrelevant to that trial. It is somebody who had extensive information to know this fact and who stated that fact in the proceeding. I'd like to just address floscazation briefly, given that it was extensively discussed. I'm frankly bewildered by the assertion that all of the cases are sort of going the other way. We cite numerous cases showing exactly the standard that we're applying. And I can cite from the Supreme Court in Affiliated U, which states, the correct measure of damages is the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct. And our assertion here is we need not show some other alternative world where he would have engaged in a different transaction. What he would have received if he wasn't induced to sell is retention of his shares. And those shares were worth more than the deal price. Retention of his shares was more than the deal price? That's it. So we allege— Not at the time of the closing. We allege extensively that the fair value of the shares was greater than the deal price. And we allege that based on the projections. We allege that based on the subsequent disclosure by defendants that the company was undervalued, which they stay in the relisting. And so the argument that we've put forward— But that's a statement that's a truism, basically. All you have to then argue or allege is that fair market value was higher and you've got yourself lost causation. What we need to allege is, meeting the pleading standards, that we need to meet the pleading standard of providing a plausible showing that the fair value of the shares was greater than the price that parties received when selling. And we've done that in spades. We've alleged that the projections show that the fair value was higher. We've alleged that the subsequent relisting supports the idea that the high fair value— But that's two years later. That's two years later. What do you have in this complaint that shows that at the time of the closing, the fair market value was higher? Two facts are most persuasive to that. One, the updated projections. The updated projections, which you don't have. You don't even know what they say. We know that they show more than four times greater growth for the company than what was disclosed in the projections. But you don't know—I mean, for all you know, those could be completely pie-in-the-sky projections that would support securities fraud over the investors in the buyout. I have two responses to that. One, I feel like that question is, again, inferring facts against the plaintiffs. We don't know— No, no, no. We're just groping for facts. I mean, you don't have these projections. You're relying on a non-transcript summary of what a lawyer said in an appraisal proceeding in the Cayman Islands, which gives a hint of what maybe they said. It doesn't give a hint of what was said. It says the specific rate. It says that if you look at the pleadings that we have, we state that the projections showed higher growth. It says that they ran until 2019 and showed a consolidated annual growth rate in income of 19 percent compared to a meager 4.65 percent in the disclosed projections. We don't have nearly some vague understanding that there was— Okay, so what—and then what is the conclusion that—what are the facts that are alleged to show that that would equal a greater premium on the share price than what was already baked into the proxy? What we allege is that the fair value of the shares was higher than the deal price, not necessarily that a bigger premium would have emerged through an alternative deal. And in support of that, we have the projections themselves. What we also have is that during July, before the merger closed, Zhao and other members of the buyers group pitched subsequent investors with a slide deck that used those subsequent projections and had a slide titled Valuation that stated that just the core of e-house was worth more than the deal price, not even including its hundreds of millions of dollars worth of non-core businesses. And what we also have is a subsequent disclosure in the relisting. I'm not just talking about the relisting price, but an actual disclosure in the relisting that states that the reason that the buyout was conducted was because the company was undervalued in the United States and because the buyers group wanted to conduct its capital markets transactions. And so together, that goes far more than plausibly alleging that the fair value of the shares was greater than the deal price. And we then will need, down the road, to put forward experts and to use evidence to establish precisely what the fair value was. But at the pleading stage, our obligation is only to show, plausibly, that some loss was suffered. Well, thank you both. Well argued. We will reserve decision. That concludes the argument calendar. We have two other cases that are on submission. We'll reserve on those as well. And let me ask the clerk of court to adjourn the court with the thanks of the court. Court is adjourned.